**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT COLUMBUS**

| | | |
|---|---|---|
| Murray Energy Corporation; American Energy Corporation; OhioAmerican Energy, Incorporated; and The Ohio Valley Coal Company; | * * * * | |
| | * | Case No. 2:15-cv-448 |
| Plaintiffs, | * * | Judge |
| | * | |
| v. | * | |
| | * | |
| Thomas E. Perez, Secretary of Labor, and Mine Safety and Health Administration, | * * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

---

## COMPLAINT

---

Plaintiffs, Murray Energy Corporation, American Energy Corporation, OhioAmerican Energy, Incorporated, and The Ohio Valley Coal Company ("Plaintiffs"), hereby file this Complaint against defendants Thomas E. Perez, Secretary of Labor (the "Secretary"), and the Mine Safety and Health Administration (collectively, "Defendants"), and in support thereof state as follows:

### NATURE OF ACTION

1.      Plaintiffs seek invalidation of a final rule promulgated by a federal administrative agency.

2.      Created by virtue of the Federal Mine Safety and Health Act of 1977, as amended, 30 U.S.C. § 801, *et seq.* (the "Mine Act"), the Mine Safety and Health Administration ("MSHA" or "Agency") is the administrative agency within the United States Department of Labor charged

1

with implementing and enforcing the Mine Act.  The Mine Act directs the Secretary of Labor ("Secretary") to establish mandatory safety standards, *id*. at § 811; to monitor compliance through "frequent inspections" of each mine—at least four per year for underground mines, *id*. at § 813(a); and, where necessary, to deploy various enforcement tools to ensure that mine operators comply with MSHA's rules.

3.      Defendant Thomas E. Perez is the Secretary of Labor and is primarily responsible for the execution and enforcement of the Mine Act and the establishment and enforcement of MSHA's regulations.

4.      Plaintiffs are underground coal mine operators subject to regulation and enforcement action by MSHA.  They are headquartered in St. Clairsville, Ohio, and do business within Ohio.

5.      One of the enforcement tools available to MSHA is the Mine Act's pattern of violations ("POV") provision, found in Section 104(e) of the Mine Act. *Id.* at § 814(e) ("POV Provision").  It contemplates that MSHA will promulgate rules to determine when a mine operator exhibits a pattern of violations that are of such a nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard. *Id.*

6.      In January of 2013, Defendants promulgated a rule purporting to implement the Mine Act's POV Provision. 78 Fed. Reg. 5056 (Jan. 23, 2013) ("POV II" or "2013 Rule").  This rule altered and replaced the existing and original POV Rule, promulgated in July of 1990. 55 Fed. Reg. 31128 (July 31, 1990) ("POV I" or "1990 Rule").

7.      In promulgating the POV II Rule, MSHA violated the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.  The 2013 Rule exceeds the scope

2

of MSHA's authority under §104(e) of the Mine Act, contains provisions that are contrary to congressional intent, and, on its face, violates the constitutional guarantee of due process of law.

8. Accordingly, Plaintiffs bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., the Fifth Amendment to the United States Constitution, the Mine Act, and the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking the invalidation and/or repeal of MSHA's 2013 POV Rule.

9. Plaintiffs believe that the complaint against Thomas E. Perez and MSHA by Plaintiffs Ohio Coal Association, Kentucky Coal Association, National Mining Association, National Stone, Sand, and Gravel Association, and Portland Cement Association, ("Ohio Coal Association, et al.") docketed in the United States District Court for the Southern District of Ohio at 2:14-cv-02646, is a related action. Both actions arise out of the same rulemaking by MSHA, and seek invalidation of the contested 2013 POV Rule.

10. Plaintiffs hereby incorporate by reference each and every allegation, fact, and cause of action set forth in the complaint of the Ohio Coal Association, et al., as if fully set forth herein.

## JURISDICTION AND VENUE

11. Pursuant to 28 U.S.C. §1331, the Court has original jurisdiction over all matters arising under the constitution and laws of the United States.

12. Plaintiffs seek relief regarding matters arising under the APA, the Mine Act, and the United States Constitution, all of which are laws of the United States.

13. Jurisdiction is also appropriate under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and the APA, 5 U.S.C. § 701 *et seq*. MSHA's deficient POV II rule aggrieves and

3

wrongs Plaintiffs on an ongoing basis, as discussed more fully below.  The POV II rule is unlawful and must be vacated.

14.    This venue is appropriate under 28 U.S.C. § 1391(e)(C) because Plaintiffs reside in this district.

15.    The Mine Act does not describe a specific route for judicial review of the POV II rule.  Although the Mine Act provides that "mandatory health and safety standards" are to be reviewed in the first instance in the circuit court of appeals, 30 U.S.C. §811(d), the United States Court of Appeals for the Sixth Circuit determined that POV II is a regulation. *See Nat'l Mining Ass'n v. Sec'y of Labor*, Nos. 13-3324/3325, 763 F.3d 672 (6th Cir. 2014) (dismissing petition for review of POV II rule for lack of jurisdiction because it is a regulation, as opposed to a mandatory health or safety standard).

16.    This action does not relate to any pending or issued POV notice, and is therefore collateral to the statutory procedures prescribing review of enforcement actions by the Federal Mine Safety and Health Review Commission (the "Commission").  30 U.S.C. §§ 815 and 823.

17.    Plaintiffs' APA, statutory, and constitutional claims are outside the Commission's jurisdiction and expertise.

18.    This Court has jurisdiction over Plaintiffs' claims as a federal question pursuant to the APA, under the Fifth Amendment to the United States Constitution, under the Mine Act, under the Declaratory Judgment Act, 28 U.S.C. § 2201, and because a finding of preclusion would foreclose all meaningful judicial review.

19.    The Declaratory Judgment Act, 28 U.S.C. §2201, grants this Court authority to declare Plaintiffs' legal rights when an actual controversy exists.

20.     As stated below, Plaintiffs and Defendants have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 29 U.S.C. § 2201.

## BACKGROUND

A.     <u>MSHA's Regulation of Mines and Enforcement Under the Mine Act</u>

21.     The Mine Act directs MSHA to promulgate and enforce mine safety and health standards, and to perform regular inspections of all mines.  MSHA's mine inspectors, also known as "authorized representatives," are empowered to enter mine property to perform inspections at any time, without a warrant or the mine owner's prior authorization.

22.     MSHA is required by statute to fully inspect underground mines at least four times each year and surface mines twice each year.  *See* 30 U.S.C. § 813.  These inspections encompass all aspects of a given operation, from maintenance of equipment, control of mining conditions, and observation of mining methods, to verification of recordkeeping and training.

23.     During these inspections, if MSHA's mine inspector identifies conditions that they believe to be a violation of the Mine Act or one of the Secretary's safety or health standards, they will issue a written enforcement action to the operator of the mine in the form of a citation or order.

24.     The Mine Act provides for a system of graduated enforcement, with several different types of citations and orders that can be issued, depending on the inspector's assessment of the circumstances and the operator's compliance history.  The basic and most often used enforcement action is the 104(a) citation, so named because it arises under Section 104(a) of the Mine Act. 30 U.S.C. §814(a).  Section 104(d) of the Mine Act provides the basis for elevated "unwarrantable failure" citations and orders, which may be issued if an inspector

5

believes that the cited circumstances constitute aggravated conduct greater than ordinary negligence.  Orders issued under Section 104(d) are referred to as "withdrawal orders," because the operator must withdraw all miners from the affected area, except those correcting the cited conditions, until MSHA acknowledges that the conditions have been corrected and terminates the enforcement action.  *See* 30 U.S.C. §814(d).  If an inspector believes that the observed conditions pose an imminent danger to miners, regardless of the operator's knowledge or fault, they may order an immediate withdrawal of all endangered miners under Section 107(a) of the Mine Act. 30 U.S.C. §817(a).  While the Mine Act contemplates still other types of enforcement actions, the foregoing are the most germane to this case.

25.     MSHA's written enforcement actions all use the same form, MSHA Form 7000-3 "Mine Citation/Order."  The form contains a space for the inspector to provide a narrative description of the condition or practice they are alleging to be a violation of the Mine Act or regulations, along with several fields to indicate their assessments of the gravity and negligence of the situation.  When an inspector issues a citation or order under 104(a) or 104(d), they must make a substantive designation for each field.  Four of the fields contain a series of boxes that the inspector must select from, while the field for "number of persons affected" requires the inspector to set forth the number of miners they believe would be affected if the alleged conditions were to result in an injury-producing event.  In the other four "multiple-choice" type fields, the inspector must select from several options to communicate the likelihood that an injury will result from the cited conditions, the severity of the injury that could be expected, the level of negligence attributable to the operator, and whether the enforcement action is "significant and substantial" ("S&S").

26.     Along with some additional factors relating to the cited entity's size and enforcement history, these assessments form the basis for MSHA's proposed civil penalty for each written enforcement action.

27.     After an enforcement action has been issued, MSHA will notify the mine operator of its proposed penalty assessment.  MSHA's penalty assessments can be as high as $220,000.00, depending upon the Agency's application of six civil penalty factors, including the mine's history of previous violations. 30 U.S.C. § 820.

28.     Upon receipt of the proposed assessment, the cited entity may accept the citation as written and pay the assessed penalty, or it can opt to contest the proposed civil penalty, whether the circumstances constitute a violation at all, and the validity of any or all of the substantive designations therein.

29.     The Federal Mine Safety and Health Review Commission ("the Commission") adjudicates contested enforcement actions.   Under the Mine Act, operators who contest enforcement actions have the right to a formal hearing, with discovery and findings on the record before an Administrative Law Judge ("ALJ").   Decisions of the Commission's ALJ's are appealable to the Commission.  Decisions of the Commission are appealable to the United States Court of Appeals.  Those decisions may further be appealed to the United States Supreme Court.

30.     MSHA's regulations also provide a possible avenue for reconsideration of enforcement actions that an operator may believe were improperly issued, prior to MSHA's proposed assessment or formal proceedings before the Commission. *See* 30 C.F.R. §100.6. However, the possibility of an informal conference with MSHA under that provision provides little comfort to operators, given that the Agency has absolute and unfettered discretion to choose whether to allow the conference. *Id*.  Indeed, it has become increasingly common for MSHA to

7

deny such requests.  *See*, *e.g.*, Comments of Randy Squires, Regional Manager of Safety Relations at Newmont USA Limited, COMM-14 at 4 (March 29, 2011) (noting trend of MSHA denying requested informal conferences).

31.     The designation "S&S" exists because the Mine Act contemplates distinguishing between violations that are a mere deviation from the letter of the law, and those that "are of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard." *See* 30 U.S.C. §§ 814(d), (e).

32.     The concept of S&S is important because it is the gateway to, and prerequisite for, MSHA's departure from standard 104(a) citations to the imposition of more severe forms of enforcement, such as the issuance of 104(d) unwarrantable failure withdrawal orders or the placement of the mine operator on a POV.  In 2013, MSHA issued approximately 118,619 citations and orders; about 27% of those were designated S&S.

33.     Section 104(e) of the Mine Act provides the basis for MSHA's POV sanction. The deficient regulation in this case purports to implement that provision, which reads:

> If an operator *has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards*, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

30 U.S.C. § 814(e)(1) (emphasis added).

8

34.     Giving notice to an operator that the operator has a pattern of violations of mandatory health or safety standards is the most severe sanction available under the Mine Act, and is recognized as such by MSHA.  When an operator is placed on a POV, every subsequent S&S citation requires withdrawal of all miners from the affected area.  Once a mine is placed on a POV, the only way to remove the POV status is by accomplishing a complete inspection of the entire mine without receiving any S&S violations.

35.     The POV provision explicitly contemplates that any POV notice be based on a pattern of violations that are S&S.  The question of whether an alleged violation is S&S is a fact-intensive legal analysis.  The contours of that analysis, and what exactly "S&S" means, have been the subject of near-continuous litigation for more than 40 years.

36.     For any given citation or order, the issuing mine inspector is the individual determining whether or not to designate it S&S.  MSHA's mine inspectors generally are not attorneys, and aside from a few weeks of "citation and order writing" training at the National Mine Health and Safety Academy in Beckley, West Virginia, do not have any legal training or background.

37.     In addition to the difficulties inherent in having non-lawyers perform fact-intensive legal analyses as part of their regular duties, MSHA has failed to provide the periodic retraining mine inspectors need to effectively perform their duties.  In 2010, around the time MSHA was considering changes to its POV Rule, the problem had become so severe that the Department of Labor's Office of the Inspector General ("OIG") released a report titled "*Journeyman Mine Inspectors Do Not Receive Required Periodic Retraining*." U.S. Dept. of Labor, Office of the Inspector General, Rep. No. 05-10-001-06-001 (2010).

38.     In its investigation, OIG found that only half of the experienced mine inspectors contacted felt that MSHA provided the training they needed to effectively do their jobs. *Id*. at 16.

39.     Moreover, these undertrained and often inexperienced inspectors are under intense pressure to "over-write" citations.  *See Marfork Coal Co., Inc.*, 35 FMSHRC 738, 4 (March, 2013) (ALJ) (quoting one of MSHA's Conference and Litigation Representatives: "District 4 has seen two major disasters in recent years and, consequently, the inspectors, many of whom are inexperienced, are under pressure to write citations.  As a result, inspectors are 'over-writing' the citations."   In this context, over-writing means that the inspector alleged designations of severity, S&S, and/or negligence on the written citation that were more severe than what the circumstances actually justified.

40.     Consequently, of the S&S citations that are contested, approximately one-third are modified to non-S&S.  For example, in 2011, 70% of all issued S&S citations were subject to formal contest, and a full one-third (33%, more than 11,300) were vacated, dismissed, or modified during the legal proceeding.

## B.     The 1990 POV Rule ("POV I")

41.     The Mine Act's POV Provision directs MSHA to promulgate rules "to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists." 30 U.S.C. §814(e)(4).  Though that mandate and the POV provision were effective as of the Mine Act's passage in 1977, MSHA did not publish its first final rule, POV I, until 1990.  55 Fed. Reg. 31128 (July 31, 1991).

42.     In the preamble to the 1990 Rule, MSHA noted the Senate Committee's observation that the drafters of the Mine Act intended for the POV Provision to be used "when

the operator demonstrates his disregard for the health and safety of miners through an established pattern of violations." *Id.* at 31128.

43.     In crafting the 1990 Rule, the Agency attached importance to the inclusion of "procedures for full and fair notice, including an opportunity to respond to the Agency's initial evaluation that a pattern of violations may exist at a mine" due to the "extraordinary nature" of the POV sanction. 55 Fed. Reg., at 31129.

44.     To accomplish this, the 1990 Rule employed a three-step approach for determining whether to issue a POV.  MSHA would first review a mine's enforcement history against a series of "initial screening criteria," broader than the actual POV criteria, and then, if the initial screening revealed that a mine potentially has a serious compliance problem, apply the actual POV criteria.  MSHA would only apply the POV criteria if it found that a mine satisfied the broader initial screening criteria first.  Finally, if a mine fulfilled both the initial screening and POV criteria, MSHA would make a discretionary decision whether to issue a POV notice, with "meaningful opportunities [for the operator] to present… information as to why MSHA should not issue the pattern notice." *Id*. at 31133.

45.     The 1990 Rule provided that after determining that a mine met both the initial screening and actual POV criteria, but before issuing a POV notice, MSHA would issue a notice of a "potential pattern of violations" ("PPOV"). *Id*.  The PPOV notice would specify the basis for identifying the mine as a pattern violator, and set forth a time frame within which the operator could respond to the notice, review the documents that form the basis for the notice, request a conference with the District Manager, and/or provide corrections to MSHA's data. *Id*.  The Agency called these procedural safeguards "an important feature of an effective pattern of violations rule." *Id*.

11

46.     The 1990 Rule recognized the distinction between "issued" and "final" citations and orders, explicitly providing that a POV could only be based on a mine's history of final S&S citations or orders (the "final order requirement"). *Id*. at 31132.

47.     An "issued" enforcement action is based solely on the allegations of the issuing mine inspector.  The enforcement action becomes "final" either when the mine operator chooses not to contest it, or when it has been adjudicated and determined to be valid by one of the Commission's ALJ's.

48.     During the comment period for the 1990 Rule, MSHA considered comments both for and against the final order requirement. *Id*.  MSHA's decision to include the final order requirement in the 1990 Rule is an implicit acknowledgement of its constitutional obligation to allow for due process in its implementation of the POV Provision, and is consistent with the Agency's repeated emphasis in POV I on fairness and adequate notice.

## C.     The 1990 Rule Was an Effective Enforcement Tool, Dramatically Improving Safety in the Industry While Respecting Due Process

49.     When POV I was promulgated in 1990, annual mining-industry deaths numbered over 100 per year.  Over the following 20-plus years, industry-wide (covering all underground, surface, and mill/prep plant operations) fatality and injury rates dropped consistently and dramatically.  For example, in 2011, the year MSHA published its proposed POV II Rule, there were 37 industry-wide fatalities. *See* MSHA – Mining Industry Accident, Injuries, Employment, and Production Statistics, accessed 12/31/2014, *available at* http://www.msha.gov/ACCINJ/ALLMINES.HTM.

50.     In 1993, the industry-wide injury rate was approximately 49.31 reported injuries per 200,000 man hours worked. *See Id*. This value was calculated by determining the injury rate

12

per 200,000 man hours for each industry segment (underground, surface, mills/prep plants) and then adding those values together.

51.     In 2011, the same industry-wide injury rate sat at 2.73 injuries per 200,000 man hours worked. *Mine Safety and Health at a Glance*, *available at* http://www.msha.gov/mshainfo/factsheets/mshafct10.htm (dated June 30, 2013).

52.     In addition to the dramatic and lasting downward trend in fatality and injury rates that occurred while POV I was effective, the final order requirement was not an impediment to the Agency's use of the POV enforcement tool.

53.     Between 2007 and 2013, MSHA issued 98 PPOV notices to mine operators, and issued POV notices to two mines.  As discussed above, once a PPOV notice was issued under POV I, the third step in the process is a discretionary decision by MSHA whether or not to issue a POV notice. In the 96 instances in which MSHA elected not to issue a POV notice, it made a discretionary decision to forego use of the POV sanction.

54.     The fact that 98 mines met all of the necessary criteria for a POV between 2007 and 2013 belies any claim that the final order requirement unduly prevented MSHA from utilizing its POV authority.

55.     The PPOV system in POV I did not negate the deterrent effect of MSHA's POV authority.

56.     In the 2011 proposed POV II rule, MSHA acknowledged that of 68 mines that were issued a PPOV notice between 2007 and 2009 under POV I, 94 percent went on to reduce their rate of S&S citations and orders by at least 30 percent. 78 Fed. Reg. 5056, 5058 (2013). Fully 77 percent reduced their S&S issuance rate to levels at or below the national average for similar mines. *Id*.

13

**D.      MSHA Sought to Expand Its POV Authority Through Congressional Action Because it Knew that the Changes in POV II Exceed the Agency's Authority Under the Mine Act.**

57.      In 2010, MSHA made its first of several efforts to expand its POV authority.

58.      Because the Agency knew that the modifications it was seeking were beyond the scope of its authority under the Mine Act, it sought that expanded authority through congressional action.  The head of MSHA, Assistant Secretary Joseph Main, testified before Congress in July of 2010, seeking, among other things, amendment of the Mine Act's POV Provisions.  *See  H.R. 5663, Miner Safety and Health Act of 2010:  Hearing before the H. Comm. on Educ. and Labor,* 111th Cong. 13 (2010).

59.      The proposed new law would have replaced the Mine Act's POV Provision with a provision entitled "Pattern of Recurring *Noncompliance or Accidents*" directing MSHA to impose the pattern sanction based on an operator's history of "*citations*," "*orders*," or "*accidents, injuries, or illnesses*"—rather than only S&S "*violations*" (the language in the Mine Act). Robert C. Byrd Miner Safety and Health Act of 2010, H.R. 5663, 111th Cong. § 202 (2010).

60.      Assistant Secretary Main called the new pattern provision "the most important of [the] new tools" in the proposed law.  *Id*. at 11.  It would, he explained, "eliminate the rule that MSHA base a POV finding on final orders." *Id*.

61.      Despite MSHA's strong urging, Congress voted not to enact the proposed legislation. *See* 111th Cong. Rec. H8145 (daily ed. Dec. 8, 2010).

62.      The Agency sought, and continues to seek, congressional action because it knows and acknowledges that the POV Rule exceeds the scope of its authority by basing POV determinations on non-final citations.  Assistant Secretary Main testified again in 2011 that "MSHA needs additional tools that only Congress can provide." *Examining Recent Regulatory*

14

*and Enforcement Actions of the Mine Safety and Health Admin.:  Hearing Before the Subcomm. on Workforce Protections of the H. Comm. on Educ. and the Workforce,* 112th Cong. 23 (2011). Specifically, he argued that the POV program "is broken and can be improved only so much through regulation."  *Id*.

63.     In 2011, in spite of its failure to secure congressional action to expand its authority, and in spite of its own acknowledgment of the fact that it could not do so without Congress, MSHA reversed course and published a proposed POV rule which would eliminate the PPOV process, allow MSHA to base POV determinations on non-final citations and orders, and create new POV criteria. *See* 76 Fed. Reg. 5719 (2011).

64.     Even now, after promulgating the defective 2013 Rule in defiance of Congress, the Mine Act, and the United States Constitution, MSHA continues to seek congressional ratification of its unlawful power grab.  Bills have been introduced and are currently pending in both houses of Congress (in committee) that simply incorporate the defective 2013 Rule into the Mine Act by reference. *See* Robert C. Byrd Mine Safety Protection Act of 2013, H.R. 1373, 113th Cong. (2013); Robert C. Byrd Mine and Workplace Safety and Health Act of 2013, S. 805, 113th Cong. (2013).  Tellingly, the Senate bill acknowledges that MSHA's recommendations "can only be accomplished through the legislative process." S. 805, at 9, 113th Cong. (2013).

**E.      MSHA's Deficient 2013 POV Rule, Promulgated Only After Congress Refused to Grant the Additional Authority Sought, Violates the Mine Act, the Administrative Procedure Act, and the Constitutional Guarantee of Due Process of Law.**

65.     After failing to secure expanded statutory authority in 2010, MSHA initiated rulemaking for the present POV II Rule, and thereby began the process of usurping the very

authority it had just been pleading that only Congress could provide.  *See* 76 Fed. Reg. 5719 (2011) ("Proposed Rule").

66.     The 2013 Rule, unlawfully and without justification, gutted every single procedural protection contained in POV I.

67.     POV II eliminates the PPOV notice system, enables MSHA to issue a POV based solely on non-final citations, and, critically, fails to submit the actual POV criteria for notice and comment.

68.     The 1990 Rule's PPOV notice system addressed MSHA's and the mining industry's mutual concerns that due to the drastic and severe nature of the POV, there should be a dialog between the mine operator and the Agency prior to issuance of a POV notice, to ensure that the Agency was acting based on accurate and complete information.

69.     Under POV II, MSHA need not communicate directly with an operator at all before making a final decision to issue a POV notice.  This unwarranted change also eliminates an important opportunity to ensure that the data underlying MSHA's decision is accurate.

70.     The 96 instances under POV I where MSHA issued a PPOV notice but elected not to issue a POV show just how important and successful the PPOV process is.  In fully 98 percent of the total occasions in which MSHA had to exercise discretion as to whether or not to issue a POV after issuing a PPOV notice, the Agency ultimately concluded that the circumstances did not warrant imposition of the POV sanction.  Under POV II, MSHA would simply have issued 98 POV notices based on incorrect or incomplete information.  The elimination of the PPOV process represents a troubling and abrupt about-face from MSHA's prior position that due process required that operators have a meaningful opportunity to dialog with the Agency before issuing a POV notice. *See* 55 Fed. Reg. at 31133.

16

71. MSHA also failed to provide the actual POV criteria for notice and comment during the POV II rulemaking process. Despite insistence from several commenters for identification of the criteria for notice and comment, MSHA not only refused to address the specific criteria in the final rule, but also has empowered itself to unilaterally change the criteria at any time, simply by updating its website. 78 Fed. Reg. 5064. Commenters expressed concern about these issues during the notice and comment period.

72. POV II eliminates the final order requirement, allowing MSHA to deploy the Mine Act's most severe sanction based on inspectors' untested and frequently overturned allegations of S&S. To make matters worse, and despite commenters having raised the issue, POV II contains no provision that reverses or reevaluates a mine's POV status if a mine's POV was based on enforcement actions that are ultimately vacated or determined not to be S&S, as so often occurs.

73. The POV II Rule creates "corrective action programs" ("CAP programs"), which may be considered as a mitigating circumstance when approved by MSHA and successfully implemented prior to receiving a POV notice. CAP programs are one of only three possible mitigating circumstances identified by MSHA in the POV II final rule that could justify delaying the issuance of a POV notice. The other two enumerated possibilities are "a bona fide change in mine ownership" and "MSHA verification that the mine has become inactive." *Id.*, at 5063.

74. Like with the pattern criteria, the final rule did not reference what measures would be required for such plans, what improvements would be necessary, how long operators would have to make the improvements, what would happen if operators were or were not able to successfully meet the established benchmarks, or how the benchmarks would be determined, among the many issues to be addressed, and likewise did not subject any of these matters to

17

notice and comment.  Rather, MSHA noted that additional information was available at its website.  *Id.*, at 5063.  Consequently, mine operators were denied the opportunity to provide input about these important and onerous requirements.

75.    On its website, MSHA lists the kinds of management, operational, staffing, and engineering changes that must be adopted for an approved plan. "PATTERN OF VIOLATIONS (POV)    PROCEDURES    SUMMARY"    http://www.msha.gov/POV/POVProcedures.pdf; http://www.msha.gov/POV/POVsinglesource.asp.  Preparing and submitting a CAP plan prior to receiving a POV notice is a significant and costly undertaking, to say nothing of the difficulty of securing MSHA's approval and then actually implementing the plan successfully.

76.    MSHA does not dispute that its plan approval mandates will have significant impacts on the industry.  "MSHA identified 313 mines that either met all of the initial screening criteria or all but one of the initial screening criteria.  MSHA believes that most mine operators in this situation will submit and implement corrective action programs.  MSHA believes that almost 90 percent (or 275) of these mines will submit corrective action programs in the first year under the final rule." 78 Fed. Reg. 5064, at 5068.

77.    Despite the concerns raised by stakeholders and the illegality of the provisions discussed above, MSHA promulgated the POV II Final Rule on January 23, 2013.

**F.    Consistent with MSHA's Emphasis on Fairness and Due Process in POV I, MSHA's Long-Term Record of Erroneously Issued S&S Enforcement Actions Weighs Heavily In Favor of Maintaining Appropriate Due Process Protections.**

78.    Imposition of the POV sanction is based primarily on S&S enforcement actions. The question of S&S is a nuanced and fact-intensive legal analysis.

18

79.     The initial determination of whether an enforcement action is S&S is made on-site by one of MSHA's mine inspectors during their inspection.  These inspectors are typically non-lawyers, with little to no legal training.  Moreover, many of the inspectors do not even have significant mining experience.

80.     When MSHA's inspectors write these citations at the mine site, the culmination of their fact-intensive legal analysis is checking one of two boxes on a form, for "yes" or "no."

81.     Of the approximately 140,000 citations issued by MSHA each year, generally around 30 percent are designated S&S.  *Mine Safety and Health at a Glance*, *available at* http://www.msha.gov/mshainfo/factsheets/mshafct10.htm (dated June 30, 2013).

82.     Some of the issued enforcement actions are contested, while others are simply paid by the mine operator without modification.  According to the National Mining Association's data, in 2011, operators contested approximately 70 percent of the S&S enforcement actions issued by MSHA.  Of those contested enforcement actions, a full one-third were modified to non-S&S at some point during the contest.  This is despite the fact that the allegations of MSHA's inspectors are accorded deference in litigation before the Commission.

83.      Further, these numbers do not take into account the number of improperly S&S designated citations that mine operators end up settling or choosing not to contest.  This number is not trivial.  As with any litigation, operators must carefully balance the value to be gained from the contest with the cost of maintaining the litigation.

84.     While assessed penalties can range up to $220,000.00 for certain violations, many S&S enforcement actions are between $100.00 and $10,000.00.  The expenses to litigate a violation through an ALJ hearing and potentially Commission review are frequently much greater than the assessed penalty of the contested enforcement action.

85.     As a result, the statistics referenced above under-represent the number of improperly S&S designated citations due to the data's inability to account for the number of enforcement actions that operators chose to settle or not to contest in order to avoid costly and time-consuming litigation.

## COUNT I
### Declaratory Judgment that POV II Violates the APA Because It Is *Ultra Vires* and Exceeds MSHA's Statutory Authority

86.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 85 of this Complaint, as if fully set forth herein.

87.     An agency's power to promulgate regulations "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  The APA empowers the court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

88.     MSHA promulgated POV II based on the authority granted in the Mine Act's POV Provision, 30 U.S.C. §814(e), which directs the Secretary to make rules for determining when a POV exists.

89.     POV II exceeds that authority because it allows MSHA to deploy the POV sanction based on mere allegations.  The language, structure, and legislative history of the Mine Act all make very clear that the mere issuance of a citation or order does not constitute a "violation."  Likewise, the construction of the 1990 Rule, history of the terms "violation" and "citation" in mining enforcement as well as their common use, and the use of the terms in MSHA's other regulations, all militate towards the unambiguous conclusion that when the Mine Act says "violations" in the POV Provision, it means final and proven enforcement actions.

90.     MSHA's reservation in POV II of the ability to change the POV criteria at will and without notice by updating its website exceeds the Agency's authority under the Mine Act. Congress's mandate was to "make such rules" to establish criteria for determining when a POV exists. 30 U.S.C. §814(e).  Instead, the Secretary has inserted a placeholder saying it doesn't have to "make such rules," and instead will *announce such policy* informally, without any mandatory notice, and at its convenience.

91.     For these reasons, the POV II Rule exceeds and contravenes the Mine Act and the clear and unambiguous intent of Congress, is *ultra vires*, and therefore must be invalidated under the APA, 5 U.S.C. § 706.

## COUNT II
### Declaratory Judgment that MSHA's Failure to Subject the POV Criteria and CAP Standards and Criteria to Notice and Comment Violates the APA

92.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 91 of this Complaint, as if fully set forth herein.

93.     Under the APA, "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review."  5 U.S.C. § 702.

94.     A federal district court may hold unlawful and set aside agency action, findings, and conclusions found to have been "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

95.     The APA requires any rule promulgated by an agency to be published in accordance with notice-and-comment procedures.  5 U.S.C. § 553.  An agency's failure to comply with the notice-and-comment requirement is a ground for invalidating the rule.

21

96.     MSHA failed to follow the notice-and-comment procedures of the APA because it withheld crucial parts of the POV II rule from notice and comment.  Because the Agency failed to subject both the criteria used to make POV determinations and the standards relating to CAP plans to notice and comment, the 2013 Rule must be held invalid. See 5 U.S.C. §706(2)(D).

97.     Because the POV criteria were not subject to notice and comment, there was no opportunity for the regulated community to examine the criteria or provide input with regard to their implementation.  In fact, many commenters on the POV II rule objected to MSHA's omission of the POV criteria from the rulemaking process.

98.     Congress explicitly directed MSHA in the Mine Act's POV Provision to make "rules" to "establish criteria." 30 U.S.C. §814(e)(4).  Under the APA, any "rule" promulgated by an agency must follow formal notice and comment procedures. 5 U.S.C. § 553.

99.     POV II fails to set forth or discuss the criteria that will be used to determine whether a particular mine exhibits a POV.  Rather, MSHA's 2013 Rule states that "MSHA will post the specific pattern criteria on its website." 30 C.F.R. §104.2(b).  By doing this, not only did MSHA avoid subjecting this integral aspect of the rule to notice and comment, it has also vested in itself the ability to change the POV criteria at will, without notice, simply by updating its website.  These criteria significantly affect the rights and duties of the regulated community, and should have been subject to notice and comment.

100.    POV II failed to adequately set forth or discuss the characteristics, standards, requirements, goals, and/or consequences of the critically important and costly CAP plans.  The text of the actual rule does not even mention CAP plans.  Under the Mine Act and the APA, MSHA was required, but failed, to subject its rules regarding CAP plans to notice and comment.

22

101.    MSHA's intentional exclusion of these fundamental aspects of the POV rule from notice and comment violates the APA, and requires invalidation of the 2013 Rule.

## COUNT III
### Declaratory Judgment that POV II Violates the United States Constitution's Guarantee of Due Process of Law

102.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 101 of this Complaint, as if fully set forth herein.

103.    The Fifth Amendment to the U.S. Constitution's Due Process Clause prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law."

104.    Being placed on a POV damages or compromises constitutionally protected liberty and property interests, including but not limited to the imposition of fines, damages, compliance costs arising out of CAP plans, defending the POV notice, and getting off of the POV notice, interference with the right to operate a business, damage to stock price, damage to credit rating, increased cost of capital, and likely reputational damage from being placed on a POV.

105.    The extremely limited process provided for under the 2013 Rule – all of it post-deprivation – simply does not comport with the constitutional requirement of due process.

106.    MSHA states in the final rule that "mine operators will have an opportunity to meet with District Managers for the purpose of correcting any discrepancies *after MSHA conducts its POV screenings and issues a POV*."  78 Fed. Reg. at 5061 (emphasis added).  In contrast to the pre-POV meeting that was mandatory if requested under the POV I Rule, this meeting is discretionary and apparently limited to a check of MSHA's data.  *Id*.  There is no mention of a timeframe in which the meeting will occur or whether the meeting is

23

mandatory.  *Id.*  More importantly, the rule itself does not reference or provide for the meeting at all.  *Id*. at 5073-74.

107.    POV II provides no pre-deprivation due process, at the risk of subjecting mine operators to significant and ongoing harm based on unreliable and untested allegations, despite the consistent and historically high rate of error in S&S allegations.  The rule contains no protections against the wrongful imposition of the Mine Act's most severe sanction, and wrongfully imposes significant duties and obligations on mine operators through the required approval and implementation of CAP programs, the basis and standards for which were not subject to notice and comment.

108.    The 2013 Rule eliminates the pre-deprivation protections that MSHA had previously acknowledged that due process requires, including: adoption of identification and exclusion criteria by notice-and-comment rulemaking; use of only final citations to determine whether a POV exists; and, participation in PPOV programs with MSHA that corrected errors and improved safety.

109.    The 2013 Rule also violates due process because it fails to address situations where the enforcement actions forming the basis for the alleged POV are subsequently modified to non-S&S or vacated.

110.    The removal of the critical due process protections provided in POV I subjects Plaintiffs to the risk of improper imposition of the Mine Act's most severe sanctions, including unwarranted closure orders, imposition of disruptive and costly CAP programs, and significant reputational and financial damage.  POV II falls far short of the Constitution's requirements for due process, and therefore must be invalidated.

24

111.    For the reasons stated above, Plaintiffs are entitled to a declaratory judgment that the POV II Rule violates Plaintiffs' constitutionally-protected rights by not ensuring due process of law.

## COUNT IV
### Declaratory Judgment that MSHA's Promulgation of POV II Was Arbitrary and Capricious, In Violation of the APA

112.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1 through 111 of this Complaint, as if fully set forth herein.

113.    The APA empowers this court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114.    Defendants' promulgation of the 2013 Rule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

115.    MSHA's removal of the constitutionally required procedural due process protections contained in POV I was arbitrary and capricious because the Agency's decision to do so ran counter to the evidence before it, and because it announced no sound reason for the complete reversal of the rationale underlying the existing rule.  Likewise, the rationale and conclusions announced by the Agency in its final 2013 Rule cannot reasonably follow from the evidence that was before it, and fail to consider important aspects of the problem.  Finally, the Agency's assumptions regarding the need for and effect of POV II have no reasonable basis in fact.

116.    The mining industry enjoyed a steep and lasting downward trend in industry-wide fatality and injury rates under POV I.

117.    The vast majority of mines that were identified as possible pattern violators under POV I (i.e. were issued a PPOV notice) improved safety to levels better than the industry average after receiving a PPOV notice.  For example, between June 2007, and September 2009, more than 90 percent of the mines that received a PPOV notice made lasting improvements to safety and did not ever receive a POV notice or second PPOV notice. 78 Fed. Reg. 5056, 5058 (2013).    Despite this demonstrated record of safety improvements under POV I, MSHA arbitrarily and capriciously sought in POV II to remove all of the incentives and opportunities (*e.g.*, the PPOV notification system) that had enabled operators to accomplish these safety improvements.

118.    Contrary to MSHA's assertions, the final order requirement did not prevent the Agency from exercising its POV authority.  MSHA had the discretion to issue POV notices in each of the 98 instances in which it issued a PPOV notice.  In each of the 96 instances that MSHA elected not to issue a POV notice, it was MSHA who determined that, for one reason or another, the circumstances did not warrant imposition of a POV.

119.    In promulgating POV II, MSHA failed to acknowledge, consider, or discuss the egregious rate at which S&S enforcement actions are found to be without merit and modified to non-S&S.  This is an important aspect of the problem, and one of the principal reasons the final order requirement was present in POV I and is absolutely necessary today.

120.    MSHA offered no record evidence or justification that would suggest that the rule will improve safety, and acknowledges that it has "no reliable basis" to quantify a reduction in fatalities or injuries. *Id*. at 5069.    Nonetheless, it assumed a ten percent reduction in non-fatal injuries as a result of the rule, and proceeded to promulgate POV II based on this completely unsupported assumption. *Id*.

26

121.     For these reasons, MSHA's promulgation of POV II was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  MSHA acted in a manner contrary to evidence before it.  The Agency failed to consider important aspects of the problem and did not adequately explain or justify the reversal of its position and the removal of the constitutionally required due process protections in POV I.

122.     MSHA's promulgation of POV II was unlawful and has caused Plaintiffs to suffer legal wrong reviewable by this Court under the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.     Declare that the POV II Rule violates Plaintiffs' constitutionally-protected rights by not assuring due process of law as required by the Fifth Amendment, and vacate the POV II Rule;

B.     Declare pursuant to 5 U.S.C. §706(2)(C) that the POV II Rule is unlawful and in violation of the APA because it exceeds the Secretary's statutory authority under the Mine Act, and vacate the POV II Rule;

C.     Declare pursuant to 5 U.S.C. §706(2)(D) that the POV II Rule is unlawful and in violation of the APA because it was promulgated without observance of the notice-and-comment procedures required by law, and vacate the POV II Rule;

D.     Declare pursuant to 5 U.S.C. §706(2)(A) that the POV II Rule is unlawful and in violation of the APA because MSHA's promulgation of POV II was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and vacate the POV II Rule; and

E.     Grant other and further relief as this Court deems appropriate.

27

Respectfully Submitted,


/s/ John E. Jevicky

John E. Jevicky (0012702) (Trial Attorney)
Maxwell K. Multer (0092630)
Sarah B. Cameron (0091319)
Dinsmore & Shohl, LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8301
Facsimile: (513) 977-8141
john.jevicky@dinsmore.com
maxwell.multer@dinsmore.com
sarah.cameron@dinsmore.com

Vladimir P. Belo (0071334)
Dinsmore & Shohl, LLP
191 West Nationwide Blvd, Suite 300
Columbus, Ohio 43215
Telephone: (614) 628-6935
Facsimile: (614) 628-6880
vladimir.belo@dinsmore.com


*Attorneys for Plaintiffs Murray Energy
Corporation,* et al.